## Case No. 2,608.

### CHAPMAN v. SCHOOL DISTRICT et al.

#### [Deady, 139.][1]

#### Circuit Court, D. Oregon. Feb. 27, 1866.

DEDICATION — PROOF — DONATION ACT OF 1850—
BOND FOR CONVEYANCE—PUBLIC POLICY.

1. A dedication of land to public uses by parties in possession thereof, prior to the passage of the donation act of September 27, 1850 (9 Stat. 496), does not affect such land in the hands of other persons who may succeed them in such possession.

2. Although by the terms of the donation act, the land is granted to the settler, in consideration of his occupation thereof, prior, as well as subsequent to the passage of such act, the grant itself does not take effect prior to, or relate back beyond such passage, and therefore, a parol dedication or quitclaim to public use of a portion of such land by such settler, prior to the passage of such act, does not affect the after acquired estate in the premises.

[Cited in Myers v. Reed, 17 Fed. 405.]

3. A dedication by parol, being an attempt to pass an interest in lands, contrary to the statute of frauds, should not be allowed, unless plainly proven, and ought not to be inferred from facts not inconsistent with a contrary conclusion.

[See Robertson v. Wellsville, Case No. 11,-930.]

4. A multitude are no more meritorious in the eyes of the law, than a single person, and it ought not to be presumed that the latter has parted with his property, without benefit to himself, because a whole community, however numerous, lay claim to it.

5. A dedication to public uses, alleged to have been made within the memory of living witnesses, cannot be proved by reputation.

6. A bond made by Lownsdale and Coffin, on November 26, 1849, for a deed to a lot, upon the sole consideration that the obligors therein—"the trustees of the school and meeting house of Portland, and their successors in office"—should do and perform certain things in the condition thereof written, is a mere gratuitous promise, until performance or an accepted promise of performance of such condition, and therefore will not be enforced against the obligors in equity.

7. School district No. 1 of the county of Multnomah, is not the successor of "the trustees" aforesaid, and therefore cannot claim any interest in such bond, or enforce it.

8. A condition in said bond that "the trustees" aforesaid, should be incorporated by legislative enactment, and thereby authorized to hold the lot aforesaid, for the use of the town of Portland, for school and meeting house purposes, "exclusive of any restrictions of any school law," is not void, as being contrary to public policy.

9. The city of Portland is not the successor of "the trustees" aforesaid, and is not authorized by law to take and administer the trust proposed in the condition of said bond, and therefore, cannot claim any interest in or enforce it.

10. There is no privity between Stark, the complainant's grantor, and the obligors in said bond, and he is not bound by it nor his grantee, the complainant.

In equity.

---

[1] [Reported by Hon. Matthew P. Deady, District Judge.]

W. W. Page, for complainant.
Joseph N. Dolph, for city of Portland.
Lansing Stout, for school district No. 1.

DEADY, District Judge. This suit was before this court at the term of January, 1865, upon exceptions for impertinence to the answer of the city of Portland. Chapman v. School District [Case No. 2,607]. It is brought to quiet title to the complainant's interest in lot 3, in block 29, of the town of Portland. The bill alleges that the complainant is seized in fee simple of an undivided one fourth of said lot, and Benjamin Stark the other three fourths thereof; that the defendants—school district No. 1, and the city of Portland—wrongfully claim, and pretend to have some interest or estate in the premises, adverse to the complainant and defendant Stark, and prays a decree quieting his title, etc. Stark was not served with process and did not appear. The other two defendants filed separate amended answers on January 9 and 13, 1865, respectively.

The defendant, school district No. 1, denies the allegations of the complainant, and for further answer avers, that on November 26, 1849, Daniel H. Lownsdale and Stephen Coffin, they being then in the joint possession, under the laws of the provisional government of Oregon, of about 640 acres of the public lands, known as the Portland land claim, and including the lot in controversy, did sell to the citizens of Portland, lot No. 3, in block No. 29, and put them in possession of the same, for a valuable consideration, and did at the date last mentioned, also agree in writing to convey said lot to said citizens. A copy of this agreement is attached to the answer and marked "Exhibit A." That in accordance with such agreement the said citizens took possession of the lot and built a school house thereon, elected trustees and caused the same to be used as a public school for the education of the youth of Portland; that afterwards the said citizens were by law organized into school district No. 1, with power and authority, through directors, to conduct a school in the town of Portland; and that said school district did elect directors, who, in pursuance of an agreement with the trustees of the citizens of Portland aforesaid, made on November 24, 1852, did on behalf of such district, enter upon and occupy said lot and house for a public school, and thereafter such trustees ceased to occupy such lot and house for school purposes, "except by and through the defendant"—school district No. 1; that the defendant occupied the premises until 1857, when one McEwan entered upon them and excluded the defendant, and in 1863, gave the possession to the defendant Stark, for the purpose of defrauding the district of its use; that the defendant continued to act as school district No. 1, by virtue of the general school law of October 17,

1862, and is exclusively authorized to take charge of all property belonging to the citizens of Portland for school purposes, and is willing and now ready to maintain a school at the place in question; that Stark, at the time of the execution of the Exhibit A, claimed a portion of said land claim, including the premises in controversy, adversely to Lownsdale and Coffin, under the same laws, and in 1850 said Stark, and Lownsdale and Coffin, compromised their conflicting claims to the said land claim, and thereby established the boundary between them, so as to leave the premises in question within the land claim of said Stark, and that Stark, in consideration of the premises, agreed with Lownsdale and Coffin to recognize and confirm the acts and doings of the latter, concerning lot 3, in block 29, and with full notice of the same did then and there ratify and confirm the same; that afterwards Stark obtained the land conceded to him by the establishment of boundaries, as aforesaid, from the United States, as a settler under the donation law of September 27, 1850. That at the date of the compromise aforesaid, and after making claim as a settler under said donation law, said Stark did also set apart and dedicate the premises in controversy, to the citizens of Portland for the uses of a public school for the education of the youth of said town, and continued to recognize said dedication and public right from the time when he took possession of the same as aforesaid; and that Stark, in making claim under the donation law, claimed to be a settler on such land during all the period herein referred to, and prior to the time of the settlement of the conflicting boundaries between himself and Lownsdale and Coffin.

The amended answer of the city of Portland is substantially the same as that of the school district, except that it avers that the corporation of Portland, is entitled to the trust alleged to have been created by the bond of November 26, 1849, and the proceeding thereunder, and not the school district, and that all the conditions upon which said bond was made, have been performed by or on behalf of the citizens of Portland, and that the municipal corporation is legally entitled and capable of taking such trust and administering it.

The cause was heard upon the amended bill, answers, exhibits thereto and proofs. Upon careful consideration of these, I find the following conclusions of fact to be satisfactorily proven:

1. That on May 22, 1849, certain persons subscribed a writing whereby they agreed to pay severally, certain sums of money, to such persons as a majority of the subscribers should designate, for the purpose of building a school and meeting house in the town of Portland; and that such subscribers, at a meeting of the same, held at Portland, June 5, 1849, did elect William M. King, Stephen Coffin and William Warren, Sen., trustees, to carry into effect the purpose of such subscription, and did then and there authorize such trustees to purchase a lot and provide for the building of such school and meeting house in Portland.

2. That on July 2, 1849, the trustees aforesaid, by the name and description of the "trustees of the subscribers of the Portland school and meeting house," did agree in writing with William Warren, Jr., for the construction of "a house for the purpose of a school and meeting house," for which the contractor, Warren, was to receive from such trustees the sum of twenty-two hundred dollars.

3. That on November 26, 1849, Daniel H. Lownsdale and Stephen Coffin, were in the actual possession of the public land, commonly called the Portland land claim, which included the premises in controversy, and that being so in possession, the said Lownsdale and Coffin, did make and sign the following bond for a deed to said premises: "Know all men by these presents that we, Stephen Coffin and Daniel Lownsdale of the town of Portland, in the territory of Oregon, are bound and firmly held, in the penal sum of three hundred dollars, good and lawful money of the United States, unto the trustees of the school and town meeting house, in the aforesaid town of Portland, who now act as such, and to their successors in office, for the punctual payment of which, we bind ourselves, our heirs and administrators or executors firmly by these presents, in witness whereof, we have hereunto set our hands and affixed our seals, this 26th day of November, A. D. 1849. The conditions of the above obligation are such, that having this day sold unto the citizens of the town of Portland all that lot or parcel of land, known on the plat of said town, as lot number three in block twenty-nine, being fifty feet in front on First street, and running one hundred feet back, and lying on the western side of said street, and by these presents given possession of the same—Now, know you, that if the people of this beforenamed town of Portland, shall elect any number of trustees to frame a constitution for a body corporate, and they the said trustees, shall be authorized thus, as trustees of said property to hold the same for the use of the town of Portland, exclusive of any restrictions of any school law, and if they shall be thus constituted trustees by the legislative body of the territory of Oregon, and they be limited to use and keep the same for a school, or for holding town meetings, or holding such meetings for the improvement of youth, the advancement of science or such other purposes as they, the people of said town shall see fit; provided, however, that nothing but holding courts (in the absence of a more suitable place being provided by the county), shall interfere with the holding schools in the same, except in case of public emergency,

for holding public meetings. And if the said Stephen Coffin and Daniel H. Lownsdale, shall make or cause to be made, a quitclaim deed to the beforenamed lot, then this obligation shall be null and void, and of no effect, otherwise to remain in full force and virtue. (Signed) D. H. Lownsdale, Agent for Stephen Coffin. (Seal.) D. H. Lownsdale. (Seal.)" And that the foregoing instrument was received for record in the clerk's office of Multnomah county, on September 6, 1864, and there duly recorded.

4. That during the autumn of 1849, the "trustees of the subscribers to the Portland school and meeting house," caused to be built upon lot number three, in block number twenty-nine, described in the bond aforesaid, the house, as per contract with William Warren, Jr.

5. That on August 8, 1851, a large portion of the original "subscribers to and proprietors of the Portland school and meeting house," executed a writing, whereby they authorized William M. King, one of the trustees aforesaid, to sell at auction said house and lot, and to divide the proceeds between such subscribers.

6. That from the erection of the house, in 1849, until November 4, 1852, it was occupied from time to time for public meetings, both religious and secular, holding courts and private schools, under the express or implied sanction and permission of the trustees aforesaid, or some of them.

7. That on November 4, 1852, the directors of school district No. 1, took a lease in writing of the premises in controversy from William M. King and Z. C. Norton, acting on behalf of "the owners and proprietors" of the house aforesaid, for the term of twelve months, for the purpose of keeping a common school for the district therein, at the monthly rent of ten dollars.

8. That school district No. 1 has never been in the possession of the premises in question, or used, occupied or controlled them, otherwise than as above stated; and that the city of Portland has never been in the possession of the premises, or used, occupied or controlled them in any manner, although during all the time from the erection of the house to the year 1855 or 1857, the inhabitants of Portland, or some portion of them, did hold meetings there from time to time as above stated.

9. That the defendant, Benjamin Stark, was a settler upon a portion of the Portland land claim aforesaid, containing about forty acres, and including the premises in controversy, from September 1, 1849, and for four years thereafter, under and by virtue of the provisions of the act of congress, approved September 27, 1850, commonly called the donation law, whereby he became the donee and owner in fee simple of such forty acres, including the lot in controversy, and that in pursuance of such settlement, and the proper proof thereof, a patent therefor issued to the

said Stark, from the United States, bearing date December 8, 1860, which patent was received for record in the clerk's office of Multnomah county, November 16, 1865, and there duly recorded.

10. That on September 12, 1864, the defendant Stark, by his duly authorized attorney in fact, William Cree, did convey by deed of quitclaim and release, the undivided one fourth part of the lot in controversy to the complainant, for a valuable consideration, which deed was received for record, in the clerk's office of the county of Multnomah, September 13, 1864, and there duly recorded; and that the complainant was at the commencement of this suit a citizen of the state of Maine, one of the United States, and had the legal estate in the undivided one fourth part of the premises in controversy.

11. That on March 1, 1850, and prior to the settlement on the Portland land claim by Lownsdale or Coffin, the defendant Stark claimed to be entitled to the possession of an undivided half of the whole of such claim, but that on the date last aforesaid, the said defendant Stark entered into an agreement in writing with said Lownsdale, whereby the said Stark and Lownsdale compromised and settled their conflicting claims to the possession of the land claim aforesaid, so that, among other things, the said Lownsdale released and quitclaimed to the said Stark the forty acres of said land claim above mentioned, in consideration of which, the said Stark among other things, agreed with the said Lownsdale to ratify and confirm the conveyances "made by the said Lownsdale previous to January 1, 1850," of the lot in controversy; and that subsequently Stephen Coffin ratified and assented to this agreement and settlement of the conflicting claims.

12. That said defendant Stark never made any dedication of the lot in question to either of his co-defendants, or to any public use whatever, although on several occasions since the year 1855, he, in casual conversation, expressed a purpose or willingness to convey the same to the city or public, provided they would reimburse him the expenses he had incurred in improving the property and the streets and walks around it, but that nothing was done by either party to carry out such purpose or intention.

13. That since the commencement of this suit, the defendants, "school district No. 1, and the city of Portland, have each, through the agency of the officers of such corporation, assessed the lot in question to said Stark as the owner thereof, and collected and received from him the taxes properly leviable upon said assessment."

14. That the town of Portland, including the Portland land claim aforesaid and the land claim of John H. Couch, was first erected and constituted a city corporate, by the name of the "City of Portland," by act of the legislature of the territory of Oregon, passed January 23, 1851. That by said act it was

provided, that the "mayor, recorder and council of said corporation shall be a body corporate and politic, * * * and shall be capable in their corporate name and capacity to acquire property, real, personal and mixed, for the use of said corporation, with power to sell and convey the same;" but that by such act no provision whatever was made, whereby the city of Portland or the inhabitants thereof could or might accept the trust specified in the bond from Lownsdale and Coffin, nor does such act contain any provision by which such corporation is authorized or permitted to receive, hold or use land for the purpose of education or religious meetings, or in anywise to provide for, conduct or carry on any such scheme or enterprise. This act was superseded by the act of January 31, 1853, which latter act was in turn superseded by the act of January 24, 1854. This last mentioned act was amended by acts passed respectively January 15, 1858, October 17, 1860, and October 17, 1862. The act of January 24, 1854, and the amendments thereto, were superseded by the act approved October 14, 1864, which still remains in force; but none of these acts, subsequent to the first, changed or enlarged the powers of the corporation, with reference to the subjects above mentioned.

15. That the defendant, the school district No. 1, is a public corporation existing under the laws of Oregon, now and since November 4, 1852, but at what time prior thereto it was organized and established does not appear. The first act passed in Oregon in relation to common or public schools, and authorizing and providing for the establishment and organization of school districts, was passed September 5, 1849. This act authorized and required the county school commissioners of the respective counties, before January, 1851, to lay off their respective counties into school districts, and allowed the people of any town or neighborhood, until this was done, to form school districts for themselves, "and perform all acts and duties therein, in accordance with the provisions of this act." The directors of a district constitute a corporation, and as such corporation might receive for the use of the district, lands whereon to build a school house. This act was amended by acts passed respectively January 15, 1852, and January 31, 1853. The act of September 5, 1849, and the acts amendatory thereof, were superseded by the act passed January 12, 1854. This latter act was also amended by the acts passed respectively January 31, 1855, and January 17, 1857. The act of January 12, 1854, and the acts amendatory thereof, were superseded by the act of October 17, 1862. All of these acts subsequent to the first, contain similar provisions for the establishment and organization of school districts, declare them to be corporations, and authorize them to purchase and hold lands, whereon to build school houses for the use of district

schools, subject to the limitations and restrictions of the school law. But none of these acts authorize or permit a school district to hold lands generally, or to maintain any particular or special description of school. The school district is independent and separate from any town organization. It is established and its boundaries defined by a county officer, and these may be wholly changed and modified from time to time to suit the wants and convenience of the public interested, including that of the neighboring districts.

16. That the complainant had notice of the foregoing facts, at the date of the conveyance to him, by Stark.

Upon this state of facts, what is the law of the case, or what are the legal or equitable rights of the parties, to the premises in controversy, is the question for the court now to determine. The claim of the defendants before the court, or either of them, that Stark dedicated this land to public uses, being found untrue in point of fact, is thereby disposed of. But as this point was insisted upon in the argument with some degree of earnestness, it is proper to give it a more extended consideration. To do this properly, it is necessary to lay out of view such matters as have no legal bearing on the question. And first, this is not a case like some cited in the argument, where the particular public claiming a dedication, have been long in the uninterrupted use and enjoyment of the property. In such cases, the use or possession itself, though not sufficient to constitute a title under the statute of limitations, is treated as evidence of a dedication, and by the aid of indirect evidence, deduced from other independent facts and circumstances, may be sufficient, in the absence of proof to the contrary, to warrant a court in presuming that a dedication had actually been made. But this fact is wanting in this case—neither of the defendants before the court have ever been in the use and occupation of these premises, except in the solitary instance of the school district above mentioned, and that was as a tenant, and not adversely to Stark. There is no presumption then in favor of the claim of defendants, on the ground of user or occupation.

Again, upon the question of dedication by Stark, the acts and doings of Lownsdale and Coffin are not to be considered—they have no legal relation to the subject. As to this matter, Stark and these parties are strangers, without privity of any kind. By this is meant, that a dedication or promise of a dedication by Lownsdale or Coffin, does not bind Stark and is immaterial with reference to the present inquiry. The reason of this—as has been suggested, is because there is no privity of estate between Stark and these persons. At the date of the bond from Lownsdale and Coffin, they only had the naked possession of the land, under the laws of the provisional government of Oregon, without any estate or

interest in the premises whatever. Their acts and doings in no way bound the lands in the person who might succeed them in the possession. This state of things remained unchanged at the time of the agreement of March 1, 1850. The land was public domain —the title was in the United States, and congress passed no law by which any person could acquire any interest in this land, until September 27, 1850. Lownsdale v. Parrish, 21 How. [62 U. S.] 293. At the time of the agreement of March 1, 1850, Stark claimed to be entitled under the local law, to the possession of the undivided half of the whole claim of 640 acres, and in consideration that he would abandon such claim, Lownsdale thereby agreed and did abandon to Stark the exclusive possession of the forty acres of the claim, including this lot. Whatever, out of abundance of caution, may be the technical language of the agreement, this is the legal effect of it, because at that time, the possession, subject to the right of the United States, was all the parties had to bargain about or dispose of. This possession then, Stark took unencumbered by the previous acts and doings of any one—"as though the foot of man had never been on the land." Lownsdale v. Portland [Case No. 8,578]. Subsequently, by virtue of his settlement under the act of September 27, 1850, Stark acquired the legal estate in the premises from the United States. This estate, although upon condition at its inception, the commencement of the residence and cultivation, on September 1, 1849, became absolute and indefeasible upon the completion of the performance of these conditions, on September 1, 1853, four years thereafter. Since the passage of the act of September 27, 1850, Stark being then in possession, and having the legal estate in the premises, any dedication to public uses, by him or his authority, will bind him or those claiming under him with notice. It is also claimed by counsel for the school district, that a dedication prior to that time, and subsequent to September 1, 1849, made by Stark, is binding upon the after acquired estate, for the reason that the act of September 27, 1850, granted the land to the settler on account of his residence and cultivation prior thereto, as well as subsequent. That this would be the proper construction of the law, in the case of a conveyance with covenants of warranty, or any express stipulation or agreement from which it would reasonably appear, that the parties dealt or bargained with reference to the possibility or contingency of the grantor or vendor acquiring title from the United States, I am well satisfied. But a simple quitclaim by Stark, during his occupancy and before the passage of the act granting the land, would in no wise affect the after acquired estate in the premises. Although the act of congress grants the land, on account of the prior residence and cultivation, the grant itself, cannot be said to take effect before it was made—the time of the passage of the act. A grant of land by

statute, for considerations transpiring years before, as for military services, takes effect from the date of the grant, and not the performance of the service. In point of time, the grant and the cause or consideration of it, may be identical or widely separated. This was a grant on account of residence and cultivation, on grounds of public policy—as to the future, to promote the settlement of the public lands, and as to the past, to reward those who had settled and held the country for the United States, amid extreme privation and suffering, against the dangerous and savage Indian, and in the face of a foreign power, early and strongly intrenched upon the soil, in the persons and people of the Hudson Bay Company.

I am inclined to hold that a parol dedication to public uses, rests upon no different ground than a quitclaim deed, and if made before September 27, 1850, although by a party then in possession, who afterwards took the legal estate under the act, it would not bind the afterward acquired estate. Doubtless, where a clear case of dedication, so far as the act is concerned, was made out, under such circumstances, a court of equity would be warranted in finding that the party had confirmed the act, after acquiring the estate, from evidence which in itself would be insufficient to establish the fact of an original dedication, or even might presume such a confirmation, in the absence of evidence to show that the donor had disavowed it at once, upon receiving the legal estate. Subject to these rules or principles, did Stark ever dedicate this lot to either of these defendants for public uses? Under the testimony, I am constrained to answer the question in the negative, and if necessary to go further, and say that he is not shown to have dedicated it to any public use whatever. A mere intention to make a dedication to public uses, does not constitute a dedication. Where it is claimed that a dedication has been made by parol, it ought to be shown plainly and distinctly, and not left to be inferred from facts and circumstances, at best indifferent in themselves, and not inconsistent with a contrary conclusion. Irwin v. Dixon, 9 How. [50 U. S.] 30, 31, and the cases there cited. A dedication by parol is an exception to the general and salutary rule of the law, which provides that no interest in lands shall pass without a writing. To allow this exception, except upon clear and satisfactory proof, that the dedication had received the clear assent of the owner—was actually and deliberately made—would be subversive of the policy of the law, and dangerous to private rights. A multitude, or a public corporation are no more meritorious in the eyes of the law or justice than a single individual. A man ought not to be presumed to have parted with his property, without benefit or consideration to himself, because a community, however numerous, lay claim to it. The owner of real prop-

erty may rest upon his title, and is not required to be always upon the premises, asserting his right, as against the world or any less number of persons, whom he may permit or suffer from time to time to be in the temporary occupancy or enjoyment of it. Particularly is this the case, where a private lot, laid out and marked upon the map as private property, is afterwards claimed for some special public use, like a site for a school or meeting house. Such a dedication, is in the nature of things, altogether more improbable than that of streets and public squares. The latter are entirely consistent with the donor's interest, being essential to the sale of lots, and conducive to the building up of the town—in fact, are paid for by the sale of the adjacent lots at enhanced prices. What might be satisfactory proof of the dedication of the one, would be altogether insufficient to prove the other. A person may be presumed to do what is manifestly just to the public and promotive of his own interest, as to dedicate streets to the public, as an inducement for them to buy the adjacent lots: when he ought not to be presumed to do what is not demanded by justice to the public and is contrary to that interest—as to dedicate his private property for a school or meeting house site. No adequate motive is shown to have induced such a dedication, and it ought not to be allowed unless upon clear and unequivocal proof of the fact.

The testimony upon this point only goes so far as to show that upon several occasions, in casual conversations with acquaintances, Stark expressed a willingness or readiness to convey this property to the city or the public of Portland, upon certain terms and conditions. But this was never done, for the sufficient reason, if no other, that the city or public never took any steps to obtain this conveyance, upon these or any other terms. But these conversations, construe them as you will, are no evidence of a dedication; on the contrary, they are an assertion of Stark's present title to the lot, coupled with a proposal to convey the same upon terms. They are not even evidence of a proposal to the public to convey, but are mere casual remarks to private persons. Again, if Stark, in early times, was in doubt as to what his legal rights were concerning this lot, on account of his agreement of March 1, 1850, he might very properly say, as it is claimed that he did, that he intended to maintain his right to this property, as against any private person, without thereby admitting that it was the property of the city, or that he had or would dedicate it to public uses of any kind. If the city had an interest in the premises, or was entitled to a conveyance of the lot, by reason of the agreement of March 1, 1850, that was a matter of law, and beyond Stark's control or decision, and he was not called upon to express his opinion in the premises, in the statement attributed to him by Shattuck's testimony. That writing speaks for itself, and if by force of it the city is entitled to the premises, it is so entitled, independent of any alleged dedication by Stark, and no pretence of a subsequent dedication by Stark will help it. These are the only facts, which have been proven, to show a dedication by Stark, and they are wholly insufficient for that purpose.

On the hearing, the defendants also offered the depositions of some witnesses, residents of Portland, to prove that by common reputation the property belonged in some way to the city. This testimony, besides being very meagre and unsatisfactory of its kind, was clearly inadmissible, and therefore ruled out. The matters testified to by these witnesses, are their own opinions of the controversy, or what they understood to be public opinion. They all relate to a transaction, within the memory of living witnesses, and the opinions and understanding—public repute, to which they refer, are subsequent to the commencement of this controversy, and appear to have grown out of it. Of its kind, even, it was very meagre and indefinite. 1 Greenl. Ev. § 130; McEwan v. Portland, 1 Or. 300. In this latter case, decided in 1860, the question of the admissibility of this testimony arose in an action for the possession of this same lot. Mr. Justice Stratton delivered the opinion of the court, and maintained the inadmissibility of the testimony, beyond all question, upon both reason and authority. To speak somewhat colloquially—if such hearsay testimony were allowed to be heard in courts of justice, it would be very easy (if not common), for a few active and interested persons to make a reputation on the subject of who was entitled to a particular property, and then prove it in court, by their own oaths. Such a proceeding might fitly be denominated—not improving but talking a gentleman out of his estate.

I next proceed to consider what right, if any, the defendants before the court, or either of them have or can claim, by virtue of the bond to convey, from Lownsdale and Coffin, of November 26, 1849. This bond is for a quitclaim deed to the lot in controversy. It is given, not to the public generally, nor to either of these defendants, but to the "trustees of the school and town meeting house of Portland, and their successors in office." True, the condition of the instrument recites, that the obligors had that day sold this lot unto the citizens of Portland, but the obligation is to these trustees. Indeed, no persons are specially named trustees, and the complainant's counsel objects that the bond is invalid on this account for uncertainty. But I think if such persons as are therein described, did in fact then exist, with the relation or office imputed to them by this description, that the designation is sufficiently certain. Looking

back of the bond, we are enabled to find the causes which led to the execution of the instrument, and to identify certainly, the persons intended by the description—trustees of the school and meeting house of Portland. What was the condition of the infant settlement, since grown into the city of Portland, in the spring of 1849? From the testimony in this case, and the admitted history of that period, it is evident that the population did not exceed one hundred persons, and that there were not to exceed ten or twelve houses of any kind in the place. Under these circumstances as shown by the subscription paper of May 22, 1849, and the minutes of the meeting of the subscribers thereto, dated June 5, 1849, some of the residents of the place and the adjoining neighborhood, agree to pay money to build a school and meeting house for their own use—the enterprise to be under the sole control and management of such persons as the subscribers, or a majority of them, may choose. These subscribers, on June 5, 1849, choose three trustees, and authorize them to purchase a lot and provide for the erection of the building. On July 2, 1849, these trustees let the contract to build the house, for the sum of $2,200, of which only $1,900 was ever raised and paid, and a portion of this amount was subscribed and paid after that period. Whilst the project was in this condition, the bond was executed, and I think it apparent, nay, beyond doubt, that the persons described in the bond as the "trustees of the school and meeting house of Portland," were the trustees of the subscribers to the school and meeting house, named in the minutes of the meeting of such subscribers, dated June 5, 1849. At the date of the election of these trustees, there was no such corporation in existence as a school district or the city of Portland. These trustees were appointed to represent and act only for the private individuals—the subscribers aforesaid. Under these circumstances, they purchased and took a bond for a deed to lot 3, from the then holders and occupants of the land claim, Lownsdale and Coffin—the former executing the instrument for himself and the latter. The penalty of the bond is three hundred dollars, but no consideration for the sale is mentioned or recited. The seal to the instrument imports a consideration, but, by the laws of this state, this presumption is disputable. From the nature of the transaction, the situation of the parties and the purpose intended, and from the absence of all evidence to the contrary, I am forced to the conclusion that the instrument was given without any pecuniary consideration—and without a consideration in law, this agreement could not be enforced. The only consideration which can be implied from facts in this case, to support this agreement, is that the trustees to whom it was made, should perform or procure the performance of the conditions upon which the contemplated conveyance is proposed to be made. The bond itself is a mere voluntary promise, and one sided; and until a performance of its conditions by the trustees, or perhaps an accepted promise of performance, it was in law only a proposition, revocable at the pleasure of those who made it. "Uses or trusts, to be raised by any covenant or agreement of a party in equity, must be founded upon some meritorious or valuable consideration, for courts of equity will not enforce a mere gratuitous gift (donum gratuitum), or a mere moral obligation." 2 Story, Eq. Jur. § 973.

The object of the obligor in the bond, Lownsdale, was evidently to facilitate and assist the trustees of the subscribers in their enterprise, and assist in founding a school on his property. But he has his own peculiar notions of how this should be done, and he provides that these shall be complied with, as a condition precedent to his making the conveyance. These conditions were substantially, that the people of Portland should elect trustees, and form a constitution for their government, in the management of this property and the conduct of the proposed institution, which trustees, with this form of government, were to be also incorporated by an act of the legislature of Oregon territory, and thereby authorized to hold and manage the proposed trust, subject to the limitations and restrictions in the bond specified. As it appears that the trustees of the subscribers went into possession at once, and built the house upon it, and that on March 1, 1850, Lownsdale still contemplated the proposition as in force; by the covenant which he took from Stark concerning the lot, the court may be warranted in presuming, as a matter of fact, that in the meantime there had been an undertaking on the part of the trustees to perform the conditions of the bond, and that such undertaking was a sufficient consideration to support the agreement on Lownsdale's part. As it is not necessary that the decision in this case should turn upon any doubtful question of law or fact, I will assume, that in this way there arose a sufficient consideration to support the bond. Then the question arises, has there been a compliance with that undertaking, by a performance of the conditions of the bond, by either of the defendants before this court, so as to entitle either of them to the trust proposed by the bond?

To begin with school district No. 1; is this the corporation contemplated in this bond? To this question it seems to me there can be but one answer—that it was not. It is impossible to come to any other conclusion, in the face of the express provisions in the bond, that the trustees or corporation to be constituted for the management of this property, were to hold the same for school or

meeting house purposes, "exclusive of any restrictions of any school law." At the date of this bond, the first school law in the territory passed, September 5, 1849, under which school district No. 1 was organized and constituted a corporation, was in full force and effect. To exclude the operation of this or any other school law, in the management of this proposed trust, this condition is inserted in the bond. School district No. 1 is a public corporation of the state, the creature of this law, and can only take and hold real property as a site for school houses, wherein a common school is to be kept as provided by the general law. The trustees or corporation here intended was simply a private corporation, to hold and manage this trust, according to their own constitution of government, subject only to restrictions provided in the bond, and the principal of these, is that they are not to be subject to or controlled by the public law governing public schools—the very life of school district No. 1, and its only and exclusive authority to act in any matter.

Counsel for the school district admits the force of this objection, but seeks to avoid it, by claiming that this provision in the bond is void, as contrary to public policy and law. This claim cannot be supported by reason or authority. The restriction was only to the effect that this proposed institution should be governed by its own constitution or act of incorporation, and not otherwise, which is the case with every private school or college in the state. But if this condition be contrary to law or public policy, then the proposed trust would fail, and the property remain with the donor as though no agreement had been made concerning it. If the agreement was void in this respect, it was void in toto, for this was the first condition of it. A deed which purports to convey an estate contrary to law, is void, and nothing passes by it. So the objection of the counsel goes too far, because if well taken, it would follow that there is no valid agreement to convey this property to any one. It is also claimed by counsel for school district No. 1, that the neglect of the legislature, to enact the law contemplated by the bond, is not to be allowed to work a defeat of the proposed trust. But this assumes that the legislature were in some way bound to sanction this project, for a particular school in the town of Portland, which assumption conflicts with the freedom of the legislature. The legislature was not bound to create this particular corporation described in the bond, and if they had done it, there could be no pretence, that another corporation, school district No. 1, was intended or authorized to act as the trustee of this proposed trust. The legislature may have deemed it unwise or impolitic to provide for the establishment of this peculiar kind of a school, with special endowments, in the town of Portland, independent of and in conflict with the general system of common schools, already provided for throughout the territory by the act of September 5, 1849.

It seems to have been the policy of the legislature, to provide for a uniform system of public schools, all completely subject to the authority and control of one general public law. This policy appears since to have become fixed in the constitution, which prohibits the assembly from passing any special or local law—"providing for supporting common schools"—and also enjoins upon the assembly the duty of providing "by law for the establishment of a uniform and general system of common schools." Code Or. 107, 117. But the legislature had the power and the right to judge in the premises, and whether they acted wisely or unwisely, this court is not authorized to review their action, or supply the necessary legislation, by means of a judicial decree. But the fact undoubtedly is, that the people of Portland were offered this trust, upon the condition that they would select the trustees, and form a constitution of government for the school, and procure the legislative sanction to the same, by an act creating these trustees a body corporate for that purpose. That the people of Portland, or any one on their behalf, ever undertook or attempted to accomplish, or perform any of these conditions, there is not an iota of evidence, but the contrary is necessarily inferred from all the facts and circumstances. This also involved the consent of the subscribers to the building fund, or their trustees, who were a special association of individuals, and not the people at large of Portland. That they never assented to this trust, or agreed that their organization and subscription should be merged in or transferred to this proposed corporation or trustees, is plainly deducible from the fact, that on August 8, 1851, a large number of them signed a writing, authorizing one of their trustees, to sell the building and lot, and divide the proceeds among the subscribers, in proportion to the amount paid by each.

Again, school district No. 1 does not necessarily represent the people of Portland in any particular. To-day, its territorial limits may coincide with those of the city of Portland, and to-morrow they may include other territory, or new districts may be created within these limits, leaving district No. 1 to include only a small portion of the people of the town. School district No. 1 is a public corporation subject to be changed, modified or abolished by the legislature of the state, without reference to the conditions or purposes of the trust specified in the bond of Lownsdale and Coffin. From these premises and for these reasons I conclude, that school district No. 1 has no interest, either legal or equitable, in the lot in controversy, because it is incapable of receiving or managing the

proposed trust, nor in contemplation of the agreement was it ever intended that it should.

What are the rights, if any, of the city of Portland, by virtue of this bond? At the outset, I admit that the bond may be construed without doing violence to its terms, so as to permit a municipal corporation, created and organized for civil and political purposes—such as the government of the town of Portland, to take and administer the trust therein proposed. But I do not think such construction the most reasonable one, and it appears altogether improbable, when we take into consideration the facts and circumstances attending and immediately preceding the making of the bond. But supposing all this to be otherwise, has the city of Portland ever been authorized to take and administer this trust as proposed in the bond? Certainly not, expressly. In all the legislation concerning the municipal corporation of Portland, from the first to the last, it cannot be pretended that there is any express language which covers this case, or even recognizes the existence of the proposed trust. Is such a purpose or authority to be fairly implied from these acts, or any of them? Not that I have been able to ascertain. The purposes for which land may be acquired and held by the corporation of Portland, are expressly enumerated, and they are all in aid of some municipal power expressly granted to the city. The subjects of education, secular or religious, public or private, the advancement of science or the improvement of youth are not even hinted at in any of these acts, and they contain no general grant of power from which this particular power or authority can be implied or inferred.

It seems to have been the policy of the territory as of the state since, to exclude towns and cities, as such, from the control and management of public education, and reserve that power to the organization called the school district, subject to the control of the legislature. The corporation of Portland is not authorized or empowered to keep or maintain a school of any kind, and this trust is proposed upon this condition expressly. If accepted or claimed by the city, it must be taken upon the terms and conditions prescribed. The bond, even if made for a pecuniary consideration, was a voluntary act. The obligor had a right to impose the conditions that he did. There was no law to compel him to sell or give his property for the use of a school. Whoever claims the benefit of this obligation, as trustee, must show at least a capacity in law to take and hold it upon the conditions which accompany it. The property cannot be held or claimed under the bond for any other purpose than that therein specified. From these premises and for these reasons, I conclude that the city of Portland has no interest,

either legal or equitable, in the lot in controversy, because it is incapable of receiving the proposed trust, and in contemplation of law it was never intended that it should.

What then appears to be the condition of the subject matter of this proposed trust, considered with reference to the bond, and the facts which led to and followed its execution? The truth of the matter seems to be this—sundry individuals in and about Portland, being about to build a private school and meeting house, (for however public in point of fact the intended use might be, yet in contemplation of law it was a private enterprise, just as an association to build and manage a wharf or market house would be,) the occupant of the land claim gave the trustees of this enterprise a bond for a deed to lot 3, provided they would modify their plan, and thereafter proceed according to the conditions prescribed therein. The house was soon built by these trustees, and used from time to time for private schools, religious meeting and public meetings, but no attention was paid to the conditions of the bond or any steps taken by any one to procure the appointment of the trustees and the creation of the corporation contemplated. In other words, the project proved abortive and was abandoned. A portion of the original subscribers, whose money built the house, authorized its sale, and on that authority one of the original trustees transferred or attempted to transfer the propety to some private parties. The house being practically vacant, McEwan entered under this sale and occupied until ousted by Stark in 1859, who has maintained the possession of it to this day. In the meantime, about 1857, the city was induced to set up a claim to it, on the ground of its being in some way public property, but never succeeded in obtaining possession of it. The trust never took effect—the purpose for which the bond was made was never carried out—the conditions were never complied with. Until this was done, not even the trustees of the original subscribers to whom the bond was made, could demand the performance of its obligation—the execution of the deed. The bond itself conveyed no interest in the land, it was only a promise to convey upon conditions, and the title or estate in the premises, if he had any, remained with the obligor. Near seventeen years have elapsed since the date of the bond, and nothing has been done or attempted to be done, towards accepting or carrying on this proffered trust. It probably came soon to be regarded as a visionary matter, and was abandoned for the public or common school system provided by law.

But admitting that one or the other of these corporations is entitled to take the trust specified in this bond, does the right affect the land as against the owner, Stark? The covenants between Stark and Lownsdale in the writing of March 1, 1850, are not to the obligees in the bond, and Stark is not personally liable

upon them to either of these defendants, even if they were entitled to a performance of the bond as against Lownsdale and Coffin or their legal representatives. But independent of any covenant, if Stark had purchased this land of Lownsdale and Coffin, with notice of a prior contract to convey to others, equity would compel him to perform the contract of the vendor. The original purchaser would have a lien upon the land for the purchase money as against the second vendee, Stark, which equity would enforce by decreeing a conveyance or a sale of the land to reimburse the first purchaser, unless in the meantime other controlling equities had intervened. Champion v. Brown, 6 Johns. Ch. 402; 2 Story, Eq. Jur. §§ 784, 788. But this doctrine only applies where there is a privity of estate or of representation. If Stark derived title from the obligors in the bond, then this case would come within the rule, unless the long delay of his co-defendants to assert their supposed rights, would induce a court to refuse a decree for a conveyance. But there is no privity of estate between Stark. and Lownsdale and Coffin. Lownsdale and Coffin, at the time they abandoned the possession of the forty acres to Stark, were mere occupants of the public land. They had only the naked possession, which terminated with their occupancy and the commencement of Stark's possession. They had no estate in the land to convey to Stark, and conveyed none. Lownsdale v. Portland [Case No. 8,578]. Stark took the land as an original settler, under the act of September 27, 1850. and derives his title directly from the United States, by virtue of such settlement. Therefore, if this bond had been a deed for lot 3, and made directly to the defendants or either of them, and there was no question as to their capacity in law to take such a trust, yet they would be without interest in the premises, because Lownsdale and Coffin had none to convey. There being no privity of estate between Stark and the grantors in such a deed, the grantees therein could not claim the land as against Stark, or those claiming under him. On the other hand, the defendants are not parties to the covenants between Stark and Lownsdale, and therefore he is not personally liable to them, or either of them, on account of them.

So, upon every aspect of the case, it appears to me that the well settled rules of law are against the claims of the defendants, school district No. 1 or the city of Portland. Nor does it seem to me inappropriate. in a suit of equity, considering the allegations of the defendant's answers. for the court to declare, that as against these defendants or either of them, who seek at this late day, after the property has become valuable, to entitle themselves to the benefit of this supposed trust, the right of the defendant Stark coincides with the equity and justice of the case. These defendants appear to me to be not only without right, but without merit. Their claim seems to be an afterthought, put forward long after the really meritorious parties, the original subscribers, had abandoned the scheme as visionary and impracticable.

Decree in favor of the complainant, according to the prayer of his bill, quieting his title against the claims of the defendants or either of them, and that as against such defendants, he be taken and held to be the owner in fee, and have the legal estate in one undivided fourth part of the lot in controversy, and for the costs and disbursements, one moiety thereof to be paid by each of the defendants, before the court.